[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a dissolution action commenced on May 7, 1992 by the plaintiff. The plaintiff and the defendant were intermarried at Boston, Massachusetts, on August 29, 1969 and the plaintiff has resided in the State of Connecticut for at least one next year prior to the date of the complaint. There is one minor child issue of the marriage, Megan born April 17, 1977. The parties allege that the marriage has broken down irretrievably.
The plaintiff is a self-employed photographer doing CT Page 7454 commercial work which means that he was doing work for large companies and/or advertising agencies primarily for advertising purposes and other related work done by this type of company or agency. The defendant is a housewife with absolutely no working skills at all. She is currently 46 years of age and from the way she presented herself during the course of the trial of the issues in this matter, the court doubts that she is very trainable. The defendant's education took her through the ninth grade and she was a C or D student. At home, she was sexually molested by her father and deliberately became pregnant by another male friend so that she would have a reason to marry and move out of the house.
She was married for about three or four years and had three children during the course of the marriage. Since the divorce, at about age 24, she has not seen her children of her prior marriage. She never contacted them, although one of the children did contact her about a year ago. This has been her only contact with the children of her first marriage.
While married to her first husband, she did work at Friendly's for a period of about 3 weeks. She was fired because she spent the first two or two and one-half weeks waiting on customers and then was put on the cash register where she continually made improper change for customers. As a result of her inability to make change on the payments, she was dismissed.
Since marrying the plaintiff she has not had to do any work although she did help him occasionally in the studio. Her help consisted of placing lighting where he directed her to place it and occasionally she helped him in the darkroom but she was unable to develop or process the photographs on her own. She needed as much direction as she could get from her husband.
A lot of the defendant's difficulties started approximately five years ago when she heard that her father had been arrested and jailed for sexually molesting one of the defendant's nieces. Since the time of finding out about her father's imprisonment, she has had all kinds of mental problems.
At one point, she thought she was having a heart attack and saw a Dr Chowdhury who is a cardiologist. He found CT Page 7455 nothing wrong with her heart but he did prescribe Xanax. She has been taking this drug three times a day for the last four or five years.
She has also consulted with a couple of psychiatrists over this same period of time. At one time she was seeing Dr. Harriet Wetstone whom she subsequently stopped seeing and she also saw a Dr. Fields about a year ago and has resumed seeing him starting about a month or so ago. She claims one of the reasons she has not been seeing a psychiatrist on a regular basis is because she does not have the funds to pay for her treatment.
She is subject to panic attacks. Although she has a motor vehicle her ability to utilize same is limited because she will not travel on a highway with a high volume of traffic and she will not drive more than one town away from where she currently resides, which is in Windsor Locks. She is apprehensive about having a panic attack while driving and easily becomes lost when on the road.
To complicate her condition further, she started drinking several years ago. At one time, she consumed approximately one bottle of wine per day. She has since stated that she has stopped her drinking but evidence was put in that she still drinks rather substantially. Testimony is that she has consumed three to six gin and tonics at a sitting. Her drinking is complicated by the fact that Xanax and the drinking really do not mix and as a result of her consuming liquor while on Xanax causes her to become more highly intoxicated than she ordinarily would if she had not been on Xanax.
During her panic attacks, she alleges she cries, she shakes, she becomes disoriented, has nausea and loses her memory. She has had five or six attacks in the last six months.
Her only attempt at obtaining any money for herself since the separation has been to clean houses which is the extent of her abilities to work. At no time did she have more than four or five customers and since these were jobs that took one day each and because she only did these jobs once a week or twice a month, at the most, her ability to earn any money from cleaning houses is very limited. She has applied to a number CT Page 7456 of motels for their housecleaning department but has not been hired by any of them.
The defendant currently has a boyfriend who takes her out to dinner, two, three or four times per week and has loaned her money and is probably the main reason she has been able to survive up to this point.
There is a further complication in this case. The defendant entered a document supposedly kept by the plaintiff, showing his gross in his business monthly for a period from 1973 through 1991 and into the first two months of 1992. The plaintiff was grossing roughly the first three years of the 1980's about $140,000 per year, although in 1983 it was only $104,000. In 1984, he jumped to $154,000 and then $157,000 in 1985. Again 1986 and 1987 showed a drop in his gross income but in 1988 his gross income again jumped to $160,000. In 1989 his gross income was $166,000 and in 1990, the year that he supposedly left the business to go into the insurance business, he grossed $125,000 and in 1991 when he was supposed to be in the insurance business, he grossed $95,000. He noted in 1990 that he passed the $2 million mark for gross income. The exhibit covered the years 1973 to 1992 and showed a gradual increase in his business as far as his gross income was concerned. The problem the court discovers with the gross income figures is that for part of the time he was apparently incorporated and his income tax returns which start in the year 1988 do not have either a Schedule C attached nor a corporate return but based upon his income tax returns, there seems to be a large discrepancy between the gross and the net income reported. The defendant did testify that the plaintiff maintained two sets of books, although there was no proof beyond her oral testimony to this fact.
However, based upon the gross income he was reporting and the way he was writing off large expenses to the business that might very well have been considered personal expenses and based upon charge card statements that were entered as Exhibit M, there is reason to believe that the plaintiff's income was substantially greater than shown on his income tax statements. For the first five months of 1994, the defendant shows a gross income of $29,000 but a net to him of only $9,000. On his financial affidavit he list gross income of $550 per week and net to $436 per week after taxes. Based upon his past performance, he should be making substantially more than that. CT Page 7457 potential is for a gross income well in excess of $1,000 per week.
The marital home has been sold and the parties each withdrew approximately $17,000 in cash at the time of the sale and another $100,000 is being held in escrow pending the outcome of this matter. The plaintiff has in IRA's and Keogh's approximately $78,500 and the defendant has a Fidelity Investment of $34,748. The defendant is the owner of a 1984 Mercedes 300D with a value of approximately $11,000. There is held by the parties a piece of land in Truro, Mass., valued at $70,000 or $75,000 Also, there is a Nutcracker collection being held by the plaintiff with a value of about $2,000 and some gold and silver worth about $900 plus the value of the photography business which the plaintiff values at $6,200.
The court is not sure of how good a money manager the defendant is. There was entered into evidence a substantial number of checks made out to Publishers Clearing House and American Family Publishers both of which organizations run contests claiming to give a $10,000,000 cash award to the winner. Both of them sell subscriptions to magazines and frequently sell other types of merchandise through their advertising campaign as come-ons for people to enter their give-a-ways. The defendant evidently feels that she has to purchase something every time she enters one of these contests and therefore has subscribed to numerous magazines.
A careful reading of the documentation accompanying these give-a-ways would show that these contests can be entered with no purchase made at any time during the course of the contest. The contests ordinarily last several months and may be over a year in duration and flood those people who enter with a number of inducements to continue to enter the contest to keep your numbers and buy magazines which the defendant felt she had to do to remain eligible to be a contestant. This would be one of the indications of poor money management on her part.
There was some indication that recently the defendant had had some employment doing floral arrangements — making up flower bouquets by putting together roses and ferns and wrapping them. There was no testimony as to what she earned for this work, except that she indicated she enjoyed doing CT Page 7458 this. Whether or not this would be a potential source of employment is rather questionable because the work is very simplistic and probably required a minimum amount of supervision whereas if she was to do floral arrangements constantly, it would probably necessitate having someone present to supervise her to make sure that the arrangements were done properly and satisfactorily. The court is not convinced that this is a possible source of employment for the future.
Because of the difference in the abilities and potential of these parties to support themselves in the future, the court feels the defendant's welfare is dependent upon her being able to maintain herself. On the one hand there is her lack of work skills, her drinking habits and her poor money management abilities. On the other hand, the plaintiff had established a rather lavish life-style for themselves as a married couple. it [It] would be highly inappropriate for her to revert to being a welfare recipient or otherwise survive in a sub-standard life-style.
Based upon the above and considering all the statutory factors, the court will make the following findings and orders. The court will find that the parties intermarried in Boston, Mass., on August 29, 1969. The court will further find that the plaintiff has resided in the State of Connecticut for at least one year next preceding the date of the filing of the complaint. The court will further find that there is one minor child Megan Hill born on April 17, 1977 and the court will further find that the marriage of the parties has broken down irretrievably. Accordingly the court will enter a decree as follows:
1. The marriage of the parties having broken down irretrievably, it is hereby dissolved.
2. Custody of the minor child shall be granted to the plaintiff. The court will not order any child support from the defendant to the plaintiff because of her inability to obtain employment. Should the plaintiff become aware of the defendant obtaining employment in the future while the child remains a minor, he may make an application for support.
3. The court will further order alimony in the amount of $225 per week until May 1, 1995 at which time income tax CT Page 7459 returns parties should be exchanged and at which time either party should be able to request a change of payments on said alimony, depending upon a change in circumstances. Alimony shall be payable to the defendant until she attains the age of 62 at which time she would become eligible for Social Security or upon her remarriage, whichever shall first occur.
4. The $100,000 being held in escrow shall be divided between the parties 60% to the defendant and 40% to the plaintiff.
5. The defendant shall maintain her Fidelity Investment account in her own name and the plaintiff will transfer to the defendant the sum of $33,200 to give them 60-40 split on their investments and/or pension and retirement plans.
6. The plaintiff will transfer to the defendant the 1984 Mercedes sedan.
7. The court will order the land on Cape Cod be placed on the market and sold and again the proceeds to be divided 60-40 with the defendant receiving 60% and the plaintiff 40%.
8. The plaintiff shall maintain $100,000 life insurance with the defendant as the primary beneficiary until such time as she is no longer eligible for alimony payments.
9. Each party shall pay their own debts as shown on their financial affidavits, except that if there is any federal or state taxes due for the years 1993 and for any years preceding 1993, they shall remain the obligation of the plaintiff and he shall hold the defendant harmless for any claims thereon.
10. The defendant shall have the right of visitation with her daughter but since Megan is currently 17 years of age, any rights the defendant would have for visitation would be contingent upon Megan's wanting to maintain a relationship with her mother.
11. It should be further noted that the plaintiff did withdraw approximately $89,000 of retirement funds during the years 1992 and 1993. The court shall give the defendant a credit for 50% of $89,000 or $39,500 as against other assets CT Page 7460 of the plaintiff.
12. There was some dispute over items listed on defendant's Exhibit I. The plaintiff indicated that in Section 1, page 1 the first seven items should to the defendant. Further, that the next seven items listed under contents and warehouse may go to the defendant and in returns he wants half of the rental incurred, which is currently about $600. The court will order the defendant to pay one-half of whatever the warehouse costs are to be credited against any payments the plaintiff has to make to the defendant.
13. As to the items on page 2 of Exhibit I, the plaintiff will deliver to the defendant one 25 inch TV set and in return will take back one 13 inch TV set in the possession of the defendant.
14. The plaintiff may have the rest of the items numbered 1, 2, 3, 4, 7, 8, 13, 15, 16 and 17 on page 2 of defendant's Exhibit I. Item 9, the family photos will be split between the parties. Item 10 will go to the defendant.
15. On page 3 under the heading items sold to Tollivers Item 2 will be delivered to the defendant, Item 7, the microwave, will be delivered to the defendant, Item 8 will go to the plaintiff, Items 9, 10, 11, and 12 will go to the plaintiff. Items 14 and 15 will be split between the parties. Item 16, the 25 inch TV set, shall go to the defendant. Items 17 and 19 will go to the defendant and the rest of the items will go to the plaintiff.
16. Plaintiff will pay to the defendant's attorney the sum of $5,000 within 90 days.
17. The nutcracker collection will be divided equally between the parties.
18. Any gold or silver in the possession of either party shall be split equally between the parties.
Kline State Trial Referee CT Page 7461